BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Andrew S. Friedman (to seek *pro hac vice*)
Wendy J. Harrison (CA 151090)
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
afriedman@bffb.com
wharrison@bffb.com

CHAVEZ & GERTLER, L.L.P.
Mark A. Chavez (CA SBN 90858)
Nance F. Becker (CA SBN 99292
42 Miller Avenue
Mill Valley, California 94941
Telephone: (415) 381-5599
mark@chavezgertler.com
nance@chavezgertler.com

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
John J. Stoia, Jr. (CA SBN 141757)
Theodore J. Pintar (CA SBN 131372)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
JohnS@csgrr.com
TedP@csgrr.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO RODRIGUEZ, | Case No. 08 1515 |
| Plaintiff, | CLASS ACTION |
| v. | CLASS ACTION COMPLAINT FOR: |
| FIRST FRANKLIN FINANCIAL CORPORATION, | 1. Violations of the Equal Credit Opportunity Act; and |
| Defendant. | 2. Violations of the Fair Housing Act |
| | DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT

Plaintiff Francisco Rodriguez ("Rodriguez" or "Plaintiff"), by and through his attorneys, brings this action on behalf of all others similarly situated, against Defendant First Franklin Financial Corporation ("Defendant First Franklin" or "First Franklin") seeking redress for racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA").

## INTRODUCTION

1. This class action challenges Defendant First Franklin's racially discriminatory mortgage lending practices. Defendant First Franklin has established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the "Discretionary Pricing Policy," authorized an unchecked, subjective surcharge of additional points, fees and charges to an otherwise objective risk-based financing rate.

2. Defendant First Franklin engaged in the discriminatory practices described herein while it was wholly owned by financial holding company National City Corporation, and operated as a division of National City Bank of Indiana. On information and belief, Defendant First Franklin's discriminatory practices have continued in effect after First Franklin was acquired by Merrill Lynch & Company ("Merrill Lynch"), the well-known financial management and advisory giant, in December 2006. Further, on information and belief, First Franklin's discriminatory residential mortgage lending practices extended not only to loans issued under its own name, but also those issued under the brand names of its divisions or subsidiaries. These divisions or subsidiaries include NationPoint, a retail direct-lending division of First Franklin.

3. The subjective, additional finance charges authorized by Defendant First Franklin's Discretionary Pricing Policy directly leads to minorities receiving home loans with higher interest rates and higher fees and costs than similarly situated non-minority borrowers.

4. As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups protected under 42 U.S.C. § 3604 and 15 U.S.C. § 1691.

5. Plaintiff brings this action on behalf of all minorities who have entered into

residential mortgage loan contracts that were originated, financed or purchased by Defendant First Franklin and its divisions or subsidiaries, and who have been subjected to racial discrimination (the "Class").

6. Plaintiff seeks injunctive, declaratory, disgorgement, restitution, and other equitable relief, punitive damages, and other monetary and non-monetary remedies for Defendant First Franklin's racially discriminatory conduct.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives this Court original jurisdiction over civil actions arising under federal law.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's and the Class's claims occurred in this District. Defendant First Franklin maintains its principal executive offices in this District, and the practices complained of herein were formulated and structured in this District.

## PARTIES

9. Plaintiff Francisco Rodriguez is a Latino homeowner who resides in Whittier, CA 90605.

10. Defendant First Franklin Financial Corporation is a mortgage lender with principal executive offices located at 2150 North First Street, San Jose, CA 95131. Since being acquired by Merrill Lynch in December 2006, Defendant First Franklin has acted as an operating subsidiary of Merrill Lynch Bank & Trust Co., F.S.B. Prior to acquisition by Merrill Lynch, Defendant First Franklin was a division of National City Bank of Indiana, a federally chartered bank and wholly owned subsidiary of National City Corporation.

## FACTS

### I. HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE LENDING: A LONG LEGACY

11. Racial discrimination in America's mortgage lending industry has a long legacy. As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage banks such as Defendant First Franklin.

12. According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. Today, mortgage lending discrimination is more subtle. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

13. The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in Caucasian neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

14. After redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again. Lenders began making loans to minorities, but charged them higher interest rates and loan-related fees than they charged to similarly-situated Caucasian borrowers. Loan data that mortgage lenders must now compile under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated Caucasian borrowers.

15. The HMDA requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity. In 2004, concerned with potential racial discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the

Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees charged to borrowers on high-cost loans.

16. According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites. . . . [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006) (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last viewed March 5, 2008).)

17. HMDA data for 2004 reveals profound loan pricing disparities between Hispanic borrowers and non-Hispanic whites even after controlling for borrowers' gender, income, property location, and loan amount. After accounting for those differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as likely to receive a higher-rate home loan as non-Hispanic whites. (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed March 5, 2008).) In a speech last year, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that Hispanics are more likely to receive high-cost home loans than are non-Hispanic whites. (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed March 5, 2008).)

18. Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. The situation is similar for refinancings, where there is a difference of 28.3 percentage points between blacks and non-Hispanic whites. Id. at A124, A159.

19. A growing number of research studies and investigations show that significant racial disparities still exist. Association of Community Organizations for Reform Now (ACORN), "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority

- 4 -

Homeowners in 125 American Cities" (September 27, 2005) ("[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners") (http://acorn.org/uploads/media/High_Cost_of_Credit_Report_02.doc (last viewed on March 5, 2008); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed March 5, 2008); California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf (last viewed March 5, 2008).

20. The aggregate HMDA data discussed above is representative of First Franklin, one of the nation's largest mortgage lenders. During the period from 2004 to 2006, the HMDA data reflects that Black and Hispanic borrowers were nearly two times more likely than White borrowers to receive a high cost loan from First Franklin.

21. Importantly, consistent with the consensus that the HMDA data reveals profound loan pricing disparities between minorities and Caucasians even after controlling for income and other objective factors, research studies have also generally suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans.

22. As an example, research by Howell Jackson of Harvard Law School, detailed in the article *Kickbacks or Compensation: The Case of Yield Spread Premiums* (Harvard Univ.), H. Jackson and J. Berry, available at (http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf) (last viewed March 5, 2008), concluded that the substantially higher mortgage broker compensation received as the result of yield spread premiums could not fully be explained when controlling for variables associated with creditworthiness.

23. In short, a number of researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans. Bradford, Center for Community Change, "Risk or Race? Racial Disparities and the Subprime Refinance Market" (May 2002)

- 5 -
CLASS ACTION COMPLAINT

(http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed March 5, 2008). In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans." California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007).

## II. PAST AS PROLOGUE: DEFENDANT FIRST FRANKLIN'S DISCRIMINATORY LENDING POLICY

### A. DEFENDANT FIRST FRANKLIN'S RELATIONSHIPS WITH ITS MORTGAGE BROKERS AND CORRESPONDENT LENDERS

24. Defendant First Franklin is among America's leading mortgage lenders, originating and funding mortgage loans through loan officers, through authorized mortgage brokers and through a network of correspondent lenders.

25. On information and belief, Defendant First Franklin's loan officers, mortgage brokers and correspondent lenders broker and fund loans in collaboration with Defendant First Franklin, and in conformance with Defendant First Franklin's Discretionary Pricing Policy.

26. Defendant First Franklin has established, implemented and continues to implement its Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers. By its Discretionary Pricing Policy, Defendant First Franklin has intentionally discriminated against Plaintiff and Class Members, systematically channeling Plaintiff and other Class members into mortgage loans with less favorable conditions than those given to similarly situated non-minority borrowers. This pattern of discrimination is not the result of random or non-discriminatory factors. Rather, it is the direct and intended result of Defendant First Franklin's business model and loan-funding practices.

27. Defendant First Franklin's loan officers, authorized mortgage brokers and correspondent lenders receive part or all of their compensation from Defendant First Franklin based on the interest rate charged to the borrower. Defendant First Franklin's loan officers, authorized brokers and correspondent lenders receive more compensation from Defendant First

Franklin when they steer their clients into First Franklin loans with higher interest rates, and less compensation when they place their clients into First Franklin loans with lower interest rates. These same incentives apply when First Franklin's loan officers, authorized mortgage brokers and correspondent lenders place borrowers into loans which include prepayment penalties and other onerous conditions.

28. Defendant First Franklin intentionally and actively implements its Discretionary Pricing Policy in a variety of ways, including actively educating loan officers and brokers about First Franklin's credit policies and procedures and directing its loan officers and brokers regarding the marketing of First Franklin loan products.

29. Defendant First Franklin evaluates its loan officers, authorized brokers and correspondents to ensure that they comply with Defendant First Franklin's Discretionary Pricing Policy. Because the Discretionary Pricing Policy is designed to discriminate, Defendant First Franklin has not taken precautions to ensure that application of the Policy will avoid discrimination against minorities.

30. Defendant First Franklin's Discretionary Pricing Policy permits its loan officers, authorized mortgage brokers and correspondent lenders subjectively to charge minority loan applicants yield spread premiums and other discretionary charges, and indeed provides financial incentives for them to do so.

31. This pattern and design of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

**B. DEFENDANT FIRST FRANKLIN'S DISCRETIONARY CREDIT PRICING SYSTEM: DESIGNED TO DISCRIMINATE**

32. Defendant First Franklin discriminates through its authorized mortgage brokers. Authorized mortgage brokers act as Defendant First Franklin's agents in originating mortgage loans. Authorized mortgage brokers enter into agreements with Defendant First Franklin to accept loan applications on behalf of Defendant First Franklin; communicate to loan applicants financing terms and rates set by Defendant First Franklin; tell loan applicants about Defendant

First Franklin's various financing options; and ultimately originate mortgage loans funded by Defendant First Franklin using Defendant First Franklin's forms and in accordance with Defendant First Franklin's policies and procedures.

33. Likewise, Defendant First Franklin's authorized correspondent lenders and loan officers, acting as Defendant First Franklin's agents, work with Defendant First Franklin to make loans in accordance with Defendant First Franklin's credit policies and procedures. Defendant First Franklin funds correspondent-generated loans before or shortly after they go to closing.

34. Defendant First Franklin then funds loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part or all of the risk on such loans. Defendant First Franklin actively and intentionally enforces its credit policies through its loan officers, authorized mortgage brokers and correspondent lenders in a variety of ways. Among other things, Defendant First Franklin supplies its loan officers, mortgage brokers and correspondent lenders with loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts. And, as noted above, Defendant First Franklin actively trains its authorized brokers to follow its policies and procedures, and reinforces that training with marketing support.

35. Once a loan applicant has provided credit information through a loan officer, mortgage broker or correspondent lender, Defendant First Franklin performs an initial objective credit analysis. Defendant First Franklin, at this point, evaluates numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

36. Defendant First Franklin derives a risk-based financing rate from these objective factors, which First Franklin and others in the mortgage industry simply call the "par rate." (First Franklin's brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

- 8 -

CLASS ACTION COMPLAINT

37. Although Defendant First Franklin's initial analysis applies objective criteria to calculate this risk-related interest rate, First Franklin's Discretionary Pricing Policy authorizes and provides incentives to its loan officers, mortgage brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums and other discretionary fees. Defendant First Franklin regularly communicates applicable par rates, authorized yield spread premiums, and other discretionary fees to its loan officers, mortgage brokers and correspondent lenders via "rate sheets" and other communications.

38. Defendant First Franklin gives its loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Defendant First Franklin shares in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their First Franklin loan than they would be if they had been placed in a par rate loan without a yield spread premium.

39. Defendant First Franklin's borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related. Moreover, Defendant First Franklin's policies make it more difficult for a borrower to get out of such an unfavorable loan, by including substantial prepayment penalties.

40. Defendant First Franklin's Discretionary Pricing Policy causes persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts Defendant First Franklin's minority borrowers.

41. While Defendant First Franklin's use of its Discretionary Pricing Policy for all loan applicants might appear to be racially neutral, Defendant First Franklin's use of yield spread premiums and other discretionary fees disproportionately and adversely affects minorities (relative to similarly situated non-minorities). Defendant First Franklin's Discretionary Pricing Policy causes minorities to pay disparately more finance charges than similarly situated non-

minorities, and Defendant takes no precautions to avoid this result. As the HMDA data cited herein indicates, minorities, after controlling for credit risk, are substantially more likely than similarly situated non-minorities to pay such charges.

42. Defendant First Franklin's Discretionary Pricing Policy is in fact intentionally discriminatory. In an attempt to insulate itself from the discriminatory decision-making, Defendant First Franklin intentionally designed its subjective Discretionary Pricing Policy to allow and encourage its lending agents to obtain greater profits from minority borrowers. As described above, Defendant First Franklin's Discretionary Pricing Policy by design discriminates against minority borrowers and directly causes this disparate impact.

### III. DEFENDANT FIRST FRANKLIN IMPOSED DISCRIMINATORY FEES ON PLAINTIFF

43. Defendant First Franklin's discriminatory Discretionary Pricing Policy directly damaged Plaintiff and the Class.

44. On or about April 3, 2006, Plaintiff entered into a mortgage transaction with Defendant First Franklin for two mortgage loans to finance the purchase of his home located in Whittier, CA. The aggregate principal balance of the loans was $355,000. The financing was arranged through one of Defendant First Franklin's authorized mortgage brokers.

45. The Buyer's Final Settlement Statement evidences that Plaintiff paid the following charges, among others, in connection with the transaction: a loan discount fee of $3,550.00 to Defendant First Franklin; and administration fees of $999.00 and $350.00, also to First Franklin. On information and belief, these fees were assessed and paid pursuant to First Franklin's Discretionary Pricing Policy. These fees were higher than fees charged by First Franklin to non-minority borrowers with objective credit risk factors similar to Plaintiff's.

46. Moreover, Plaintiff's loan with Defendant First Franklin included rates and terms, including significant prepayment penalties, which were significantly less favorable than rates and terms imposed on non-minority borrowers with objective credit risk factors similar to Plaintiff's.

47. As a result of Defendant First Franklin's discriminatory conduct, Plaintiff received a loan on worse terms, with higher costs, than similarly situated non-minority

borrowers.

## CLASS ACTION ALLEGATIONS

48. Plaintiff repeats and re-alleges each allegation above as if set forth herein in full.

49. This class action is brought pursuant to the ECOA and the FHA by Plaintiff on behalf of himself and all minority borrowers who entered into residential mortgage loan contracts that were originated, financed or purchased by Defendant First Franklin and its divisions or subsidiaries, and who were harmed by Defendant's discriminatory conduct (the "Class").

50. Plaintiff sues on his own behalf, and on behalf of a class of persons under Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

51. Plaintiff does not know the exact size of the Class or the identities of the members of the Class, since that information is in the exclusive control of Defendant First Franklin. Plaintiff believes that the Class includes many thousands, or tens of thousands of individuals, who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

52. All members of the Class have been subject to and affected by Defendant First Franklin's practice of assessing yield spread premiums and other discretionary fees on mortgage loans. There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a. the nature and scope of Defendant First Franklin's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

    b. whether Defendant First Franklin is a creditor under the ECOA because, in the ordinary course of business, it participates in the decision of whether or not to extend credit to consumers;

    c. whether Defendant First Franklin's policies and procedures regarding yield spread premiums and other discretionary fees are a facially

neutral credit pricing system that has effected racial discrimination in violation of the ECOA;

    d.    whether there are statistically significant disparities between the amount of the discretionary charges imposed on minorities and the amount of the discretionary charges imposed on Caucasians that are unrelated to creditworthiness;

    e.    whether Defendant First Franklin has any legitimate business justification for its policies and procedures;

    f.    whether there is a less discriminatory alternative to these policies and procedures;

    g.    whether the Court can enter declaratory and injunctive relief; and

    h.    the proper measure of disgorgement or monetary relief.

53. Plaintiff's claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class, in that Plaintiff and the other members of the Class were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

54. Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff is committed to vigorous prosecution of the Class's claims, and has retained attorneys who have extensive experience in consumer protection and credit discrimination actions and in class actions.

55. A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

56. In the alternative, Defendant First Franklin has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

///

///

## TOLLING OF THE STATUTE OF LIMITATIONS

57. The causes of action alleged herein accrued upon discovery of the discriminatory impact of Defendant First Franklin's Discretionary Pricing Policy. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims. Indeed, the data forming the basis of Plaintiff's claims was only recently released and analyzed in a comprehensive manner. Moreover, because Defendant First Franklin knowingly and actively concealed the facts alleged herein, Plaintiff and the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

58. Despite the fact that Defendant First Franklin knew or should have known of the discriminatory effect of its Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates are subjective and not based solely on risk-related characteristics.

59. Defendant First Franklin was and is under a continuous duty to disclose to Plaintiff and the Class material information regarding their loans. The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to purchase the loan and on what terms. The fact that the subjective and discretionary components result in a disparate impact on minority borrowers is also information reasonable minority borrowers would consider important.

60. Defendant First Franklin failed to disclose this information, however, and Plaintiff and Class Members reasonably relied upon Defendant First Franklin's representation that terms of their loans would be based on their creditworthiness. Defendant First Franklin's financing documents falsely foster the image that Defendant First Franklin offers competitive rates that are objectively set. However, Defendant First Franklin never discloses to its credit applicants the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles; and (b) it has authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners.

61. Due to the inherent nature of Defendant First Franklin's undisclosed Discretionary Pricing Policy and due to Defendant First Franklin's deception and concealment,

Defendant First Franklin's minority customers have no way of knowing or suspecting: (a) the existence of Defendant First Franklin's subjective credit pricing policy; (b) that they were charged additional subjective credit charges; or (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated Caucasian persons. Thus Defendant First Franklin is estopped from relying on any statutes of limitation in its defense of this action.

## COUNT I

## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

### (15 U.S.C. §§ 1691 - 1691f)

62. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 62 above as if fully set forth herein.

63. Defendant First Franklin engages in credit transactions through its offering, granting, and purchasing of residential mortgage loans.

64. By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiff and the Class than it imposes on non-minority mortgage borrowers, Defendant First Franklin has discriminated and continues to discriminate against Plaintiff and members of the Class with respect to a credit transaction on the basis of race in violation of the ECOA. 15 U.S.C. § 1691(a).

65. In addition, Defendant First Franklin's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, have a disparate impact on Plaintiff and the Class.

66. As a proximate result of Defendant First Franklin's violation of 15 U.S.C. § 1691, Plaintiff and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

67. In addition, Defendant First Franklin's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendant First Franklin acted with malice and reckless indifference to the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to

punitive damages.

68. Moreover, Defendant First Franklin continues to discriminate in violation of the ECOA against Class Members every time Defendant First Franklin provides a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendant First Franklin will continue to engage in conduct that disregards the rights of Plaintiff and members of the Class, and cause Plaintiff and the Class irreparable injury for which there is no adequate remedy at law. 15 U.S.C. § 1691(e).

69. Plaintiff and the Class ask this Court to declare the rights of the parties herein regarding Defendant First Franklin's obligation to enter into credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## COUNT II

## VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 – 3619)

70. Plaintiff repeats, re-alleges and incorporates the allegations in paragraphs 1 through 70 above as if fully set forth herein.

71. Mortgage lending and the providing of residential mortgage loans is a "residential real estate-related transaction" within the meaning of the FHA. 42 U.S.C. § 3605(b).

72. By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiff and the Class than it imposed on non-minority mortgage borrowers, Defendant First Franklin has discriminated against Plaintiff and the Class concerning their ability to participate in real estate-related transactions, and in the terms and conditions of such transactions, in violation of the FHA. 42 U.S.C. § 3605(a).

73. In addition, Defendant First Franklin's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, had a disparate impact upon Plaintiff and the Class.

74. As a proximate result of Defendant First Franklin's violation of 42 U.S.C. § 3605, Plaintiff and the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

75. In addition, Defendant First Franklin's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendant First Franklin acted with malice and reckless indifference to the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to punitive damages.

76. Moreover, Defendant First Franklin continues to discriminate in violation of the FHA against members of the Class every time Defendant First Franklin provides a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendant First Franklin will continue to engage in conduct that disregards the rights of Plaintiff and the Class, and cause Plaintiff and the Class irreparable injury for which there is no adequate remedy at law. 42 U.S.C. § 3613(c).

77. Plaintiff and the Class ask this Court to declare the rights of the parties herein regarding Defendant First Franklin's obligation to participate in credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A. An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. A Judgment awarding Plaintiff and the Class costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

C. A Judgment granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including rescission, restitution, reformation, attaching, impounding, or imposing a constructive trust upon, or otherwise restricting, the proceeds of Defendant First Franklin's ill-gotten funds to ensure that Plaintiff and the Class have an effective remedy;

D. A Judgment awarding Plaintiff and the Class compensatory damages according to proof;

E. A Judgment awarding punitive damages to Plaintiff and the Class;

F.   A Judgment granting declaratory and injunctive relief and all relief that flows from such injunctive and declaratory relief; and

G.   A Judgment or other Order granting such other and further relief as the Court deems just and proper.

DATED this 19th day of March 2008.

CHAVEZ & GERTLER LLP

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

Mark A. Chavez

*Attorneys for Plaintiff*

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

DATED this 19th day of March 2008.

> CHAVEZ & GERTLER LLP
>
> BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
>
> COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
>
> /s/ Mark A. Chavez
> Mark A. Chavez
>
> *Attorneys for Plaintiff*